## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BLACK POLITICAL EMPOWERMENT
PROJECT, et al.

          Plaintiffs,

    v.

CAROL AICHELE et al.,

          Defendants.

Civil Action No. 12-cv-03808

**HON. CYNTHIA M. RUFE**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

David Newmann (PA#82401)
Virginia A Gibson (PA#32520)
Jaimi Gaffe (PA# 309871)
HOGAN LOVELLS US LLP
1835 Market Street, 29th Floor
Philadelphia, PA 19103
(267) 675-4600

David Rubino
Dēmos
220 Fifth Avenue, 2nd Floor
New York, NY 10001
(212) 485-6239

Robert A. Kengle
Alejandro Reyes
Lawyers' Committee for Civil Rights
Under Law
1401 New York Avenue, N.W., Suite
400
Washington, D.C.  20005
(202) 662-8336

Sarah Brannon
Michelle Rupp
Project Vote
1350 Eye Street, NW, Suite 1250
Washington, DC  20005
(202) 546-4173

Counsel for Plaintiffs Black Political
Empowerment Project and Pennsylvania
Communities Organizing for Change, Inc.,
doing business as ACTION United

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ................................................................................. 1

II.     STATEMENT OF FACTS .................................................................. 5

        A.     BACKGROUND OF THE NVRA ............................................ 5

        B.     PARTIES .................................................................................. 7

        C.     PENNSYLVANIA'S FAILURE TO COMPLY WITH THE
               VOTER REGISTRATION OBLIGATIONS UNDER THE
               NVRA ..................................................................................... 10

               1.     Statistical Data ............................................................ 10

               2.     Investigation Results ................................................... 13

        D.     PRE-LITIGATION NOTICE OF SECTION 7 VIOLATIONS ................. 16

III.    ARGUMENT ..................................................................................... 17

        A.     DEFENDANTS' ONGOING VIOLATIONS OF SECTION 7
               ESTABLISH THAT PLAINTIFFS HAVE A LIKELIHOOD
               OF SUCCESS ON THE MERITS ............................................. 17

               1.     Defendants' Voter Preference Forms Do Not Comply
                      with Section 7 ............................................................... 19

               2.     Defendants Fail to Offer Voter Registration to Public
                      Assistance Clients, Even to Clients Who Affirmatively
                      Request Them ................................................................ 20

               3.     Defendants Fail to Distribute Voter Registration
                      Applications to Clients Who Leave the Voter
                      Preference Question Blank ............................................ 21

               4.     Defendants Have Failed to Offer Equal Assistance ......... 27

        B.     ABSENT AN INJUNCTION, DEFENDANTS'
               VIOLATIONS OF SECTION 7 WILL CAUSE PLAINTIFFS
               IRREPARABLE HARM .......................................................... 28

        C.     GRANTING RELIEF WILL NOT RESULT IN EVEN
               GREATER HARM TO THE DEFENDANTS .......................... 34

        D.     THE PUBLIC INTEREST FAVORS SUCH RELIEF .............. 35

        E.     RELIEF REQUESTED ............................................................ 36

IV.     CONCLUSION ................................................................................. 41

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Association of Community Organizations for Reform Now v. Miller,*
  912 F. Supp. 989 (W.D. Mich. 1996) ........................................................ 29

*Association of Community Organizations for Reform Now v. Ridge*,
  No. 94-7671, 1995 WL 136913 (E.D. Pa. 1995) ....................................... 29

*Association of Community Organizations for Reform Now v. Scott*,
  No. 08-CV-4084, 2008 WL 2787931 (W.D. Mo. 2008) ................................ 11, 29, 41

*Bimbo Bakeries USA, Inc. v. Botticella,*
  613 F.3d 102 (3d Cir. 2010) ...................................................................... 17

*Burlington N. R.R. Co. v. Bair*,
  957 F.2d 599 (8th Cir. 1992) .................................................................... 30

*Charles H. Wesley Educ. Found, Inc. v. Cox,*
  324 F. Supp. 2d 1358 (N.D. Ga. 2004) ..................................................... 34

*Charles H. Wesley Educ. Found, Inc. v. Cox,*
  408 F.3d 1349 (11th Cir. 2005) ................................................................ 29, 34

*Coleman v. Bd. of Educ. of City of Mount Vernon,*
  990 F. Supp. 221 (S.D.N.Y. 1997) ............................................................ 30

*Council of Alt. Political Parties v. Hooks*,
  121 F.3d 876 (3d Cir. 1997) ...................................................................... 30, 35

*Fla. State Conference of NAACP v. Browning,*
  No. 07-15932, 2008 U.S. App. LEXIS 7100 (11th Cir. Apr. 3, 2008) ..................... 33

*Ga. State Conference of NAACP v. Kemp*,
  No. 11-CV-1849, 2012 WL 265925 (N.D. Ga. Jan. 30, 2012) ............................. 24, 33

*Gonzalez v. Arizona*,
  677 F.3d 383 (9th Cir. 2012) .................................................................... 27

*Hamilton v. United Healthcare of Louisiana, Inc.*
  310 F.3d 385 (5th Cir. 2002) .................................................................... 23

*Harkless v. Brunner*,
  No. 06-CV-2284, Settlement Agreement (N.D. Ohio Nov. 25, 2009).. ................. 11

*Miller v. Mitchell,*
   598 F.3d 139 (3d Cir. 2010) ................................................................... 17

*Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Scales,*
   150 F. Supp. 2d 845 (D. Md. 2001) .................................................. 23, 29

*NCSD Educ. & Legal Def. Fund v. Scales,*
   150 F. Supp. 2d 845 (D. Md. 2001) ........................................................ 29

*Perrin v. United States,*
   444 U.S. 37 (1979) .................................................................................. 23

*Project Vote v. Blackwell,*
   455 F. Supp. 2d 694 (N.D. Ohio 2006) .............................................. 29, 36

*Project Vote/Voting for America, Inc. v. Long,*
   813 F.Supp.2d 738 (E.D. Va. 2011) ........................................................ 27

*Puerto Rican Legal Def. and Educ. Fund, Inc. v. City of New York,*
   769 F. Supp. 74 (E.D.N.Y. 1991) ............................................................ 31

*ReMed Recovery Care Centers v. Township of Willistown,*
   36 F. Supp. 2d 676 (E.D. Pa. 1999) ........................................................ 28

*Reynolds v. Sims,*
   377 U.S. 533 (1964) ................................................................................ 30

*Rosa v. Resolution Trust Corp.,*
   938 F.2d 383 (3d. Cir. 1991) ................................................................... 29

*United States v. Berks Cnty., Pa.,*
   277 F. Supp. 2d 570 (E.D. Pa. 2003) ................................................. 30, 35

*Valdez v. Squier,*
   676 F.3d 935 (10th Cir. 2012) ................................................................. 23

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ................................................................................ 35

*Wesberry v. Sanders,*
   376 U.S. 1 (1964) .................................................................................... 30

*Wilson v. United States,*
   878 F. Supp. 1324 (N.D. Cal. 1995) ....................................................... 29

*Yakus v. United States,*
     321 U.S. 414 (1944) ............................................................................................ 35

*Yick Wo v. Hopkins*,
     118 U.S. 356 (1886) ............................................................................................ 30

**STATUTES**

25 Pa. Cons. Stat. Ann. § 1201 ....................................................................................9

25 Pa. Cons. Stat. Ann. § 1201(1) ...............................................................................9

25 Pa. Cons. Stat. Ann. § 1325(a) ...............................................................................9

25 Pa. Cons. Stat. Ann. § 1325(b)(3) .........................................................................26

25 Pa. Cons. Stat. Ann. § 1325(c) ..............................................................................27

25 Pa. Cons. Stat. Ann. § 2621 ....................................................................................9

42 U.S.C. § 1973gg(a)(1)-(2) ...............................................................................31, 35

42 U.S.C. § 1973gg-3 ...................................................................................................6

42 U.S.C. § 1973gg-5 ...................................................................................................6

42 U.S.C. § 1973gg-5(a)(2) ..........................................................................................6

42 U.S.C. § 1973gg-5(a)(4) ........................................................................................21

42 U.S.C. § 1973gg-5(a)(4)(A) .....................................................................................6

42 U.S.C. § 1973gg-5(a)(6) .............................................................................7, 18, 21

42 U.S.C. § 1973gg-5(a)(6)(A) ............................................................................ *passim*

42 U.S.C. § 1973gg-5(a)(6)(B) ............................................................................ *passim*

42 U.S.C. § 1973gg-5(a)(6)(B)(iii) .............................................................................22

42 U.S.C. § 1973gg-5(a)(6)(C) ............................................................................2, 3, 27

42 U.S.C. § 1973gg-9(b)(2) ........................................................................................30

42 U.S.C. § 1973gg(b)(1) .............................................................................................7

**OTHER AUTHORITIES**

*Black's Law Dictionary* (9th ed. 2009)......................................................................23

Department of Justice, The National Voter Registration Act of 1993 (NVRA): Questions and Answers, *available at* http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php ...............6

H.R. REP. NO. 103-66 (1993)..................................................................................7

H.R. REP. NO. 103-9 (1993)....................................................................................5

S. REP. NO. 103-6 (1993)........................................................................................5

## I.    INTRODUCTION

Just 77 days remain until Pennsylvania's October 9, 2012, deadline for registering to vote in this year's General Election.   Yet the Commonwealth of Pennsylvania continuously fails to implement the voter registration requirements of federal law. Section 7 of the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg-5 ("Section 7")  – a cornerstone of modern election law – imposes three fundamental requirements on state public assistance agencies, designed to ensure that low-income citizens who are unlikely to come into contact with other methods of voter registration are not excluded from the electorate.   The Commonwealth violates each of these requirements.

First, under Section 7, public assistance agencies must provide applicants in an NVRA covered transaction[1] with "voter preference forms" that ask whether the client wishes to register to vote and that offer to help the applicant complete the registration form.  42 U.S.C. § 1973gg-5(a)(6)(B).  Evidence from public assistance offices across the Commonwealth shows that, while some benefits application forms ostensibly include voter registration information, the content of the forms frequently falls far short of the express requirements of Section 7.   As a result, many eligible voters who qualify as applicants under Section 7 are not even notified of their right to obtain voter registration forms and assistance completing the forms.

---

[1]   Plaintiffs use the term "covered transaction" for ease of discussion.  Specifically, covered transactions are applications for public assistance benefits, as well as recertifications, renewals, and changes of address relating to benefits.  *See* 42 U.S.C. § 1973gg-5(a)(6)(A).

Second, even when public assistance agencies in the Commonwealth provide a voter preference form, they frequently fail to act in accordance with the preference expressed by the applicant.  Section 7 provides that, when an applicant makes an affirmative request to register to vote on the preference form, the public assistance agencies must not only provide the voter registration form but must provide the applicant with assistance in completing the form.  42 U.S.C. § 1973gg-5(a)(6)(A)(B)(C).  However, even under these circumstances — where the applicant affirmatively asks to register to vote — the Commonwealth regularly fails to do what Section 7 unequivocally requires. Indeed, the Commonwealth often not only fails to provide assistance in completing the forms, but fails to provide the forms themselves.  The Commonwealth's failure to honor the most basic mandate of Section 7 — to make voter registration available through public assistance agencies — is inexcusable.

Third, Section 7 does not only require public assistance agencies to make voter registration forms available to those who request them.  It goes much further.  Under Section 7, public assistance agencies must distribute voter registration forms to each and every applicant, unless the applicant expressly **declines** — **in writing** — to register to vote.  42 U.S.C. § 1973gg-5(a)(6)(A).  Under this separate requirement, an applicant's failure to answer the voter preference form does <u>not</u> excuse the public assistance agency from providing the form to the applicant.  Instead, even if the voter preference form is left blank (or the form is never provided), the public assistance agency still must provide the applicant with a voter registration form.  Rather than following this clear requirement, the Commonwealth <u>does the exact opposite.</u>  It fails to make voter registration forms

available unless the applicant affirmatively requests one in response to the voter preference form. The Commonwealth's perversion of Section 7's distribution requirements wrongfully withholds voter registration forms from countless Pennsylvanians.

Fourth, Section 7 requires public assistance agencies to provide the applicants "the same degree of assistance with regard to the completion of the [voter] registration form as provided by the office with regard to" its own forms, unless the applicant declines to register to vote or declines such assistance. 42 U.S.C. § 1973gg-5(a)(6)(C). The evidence shows that public assistance agencies in Pennsylvania frequently provide <u>no</u> assistance in completing voter registration applications, much less the "same degree of assistance" as the agencies provide for their own forms.

The Commonwealth's failure to implement Section 7's public assistance requirements has had an extraordinarily negative impact on overall voter registration in the Commonwealth. In 2009 and 2010 combined, Pennsylvania public assistance agencies submitted only 4,179 voter registration applications. During the same period, public assistance agencies in less populous states with Section 7 compliant policies, such as Ohio and Missouri, averaged several times that number <u>in a single month</u>. Moreover, Pennsylvania's voter registration numbers have declined more than 90 percent from the already low numbers it posted in 1995 and 1996 – even though the number of Pennsylvanians applying for food stamps <u>doubled</u> during that period.

Plaintiffs Black Political Empowerment Project ("B-PEP") and Pennsylvania Communities Organizing for Change, Inc., doing business as ACTION United

("ACTION United") (collectively, "Plaintiffs") are community organizations that make it part of their mission to increase voter registration and participation in Pennsylvania.  The Commonwealth's Section 7 violations force Plaintiffs to divert scarce resources to voter registration efforts that would not be necessary if the Commonwealth complied with its Section 7 obligations.  Moreover, the violations deprive eligible, lower-income voters — many of whom are among Plaintiffs' members or intended beneficiaries — of their voter registration rights under the NVRA.

The Commonwealth is well aware of its Section 7 violations, and has been for some time.  On April 23, 2012, just before the last Federal Primary Election, Plaintiffs' counsel documented these violations in writing, and asked the Commonwealth to correct them.  Three months later, it still has failed to do so.

As a result, Plaintiffs have no choice but to ask this Court to intervene.  Plaintiffs ask the Court to order emergency injunctive relief requiring Defendants to implement Section 7's requirements on an expedited basis, and bring an end to official laws, policies and practices that every day deprive countless poor and disadvantaged Pennsylvanians of the opportunity to register to vote.

## II.   STATEMENT OF FACTS[2]

### A.   BACKGROUND OF THE NVRA

A bipartisan Congress enacted the NVRA in 1993 to increase the number of citizens registered to vote, and thereby enhance voter participation in federal elections. The House Committee on House Administration expressed concern at the time of the NVRA's enactment that "low voter turnout in Federal elections poses potential serious problems in our democratic society."  H.R. REP. NO. 103-9, at *4 (1993).  The same committee determined that "failure to become registered is the primary reason given by eligible citizens for not voting."  *Id.* at *3.   The Senate Committee on Rules and Administration expressed dismay that there were "almost 70 million eligible citizens who did not participate in the [1992 Presidential] election because they were not registered to vote."  S. REP. NO. 103-6, at *2 (1993).  The House Committee ultimately concluded that "Congress should assist in reducing barriers, particularly government-imposed barriers, to applying for registration wherever possible." H.R. REP. NO. 103-9, at *3.

---

[2]  This Statement of Facts is supported by the Declarations and exhibits submitted herewith. Accompanying this Memorandum of Law are the Declarations of Sabrina Khan, sworn to on July 23, 2012, Ex. 1; Lorraine Cook, sworn to on July 18, 2012, Ex. 2; Angel Gober, sworn to on July 19, 2012, Ex. 3; Robert Glidden, sworn to on July 19, 2012, Ex. 4; La'Tasha Mayes, sworn to on July 19, 2012, Ex. 5; Youjin Kim, sworn to on July 20, 2012, Ex. 6; Declaration of Tim Stevens sworn to on July 23, 2012, Ex. 7; Declaration of Craig Robbins sworn to on July 23, 2012, Ex. 8; Declaration of David Newmann, sworn to on July 24, 2012, Ex. 9.   Also accompanying this Memorandum of Law are Declarations collected just last week from eleven of Defendants' clients, *see* Exs. 10-20.  The names and addresses of those clients have been redacted to protect their privacy.  If the Court requests, Plaintiffs can provide unredacted copies of these Declarations *in camera* or filed under seal.

It was with these concerns in mind that Congress enacted the NVRA.  The NVRA requires states to increase voter registration opportunities in several ways, including in conjunction with covered transactions through public assistance.  42 U.S.C. § 1973gg-3, 1973gg-5.  The Commonwealth, however, is not complying with the requirement to provide voter registration services at public assistance offices.

Section 7 of the NVRA requires, *inter alia,* that each state designate certain agencies, including "all offices in the State that provide public assistance,"[3] as "voter registration agencies." 42 U.S.C. § 1973gg-5(a)(2).  All voter registration agencies must distribute voter registration applications, assist with the completion of the applications unless the applicant refuses such assistance, and accept the completed applications for transmittal to the appropriate election official.   42 U.S.C. § 1973gg-5(a)(4)(A).  Agencies providing public assistance must meet additional criteria.  They must distribute a voter registration application with every application, recertification, renewal, or change of address with respect to public assistance ("covered transactions"), unless the applicant, in writing, declines to register to vote; provide a form (the "voter preference form") that includes the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?" (the "voter preference question")

---

[3]  The Department of Justice defines "public assistance" offices as "each agency and office in a State that administers or provides services or assistance under any public assistance programs. This includes any of the following federal public assistance programs: the Supplemental Nutrition Assistance Program (SNAP, formerly the Food-Stamp Program), the Special Supplemental Nutrition Program for Women, Infants and Children (WIC), the Temporary Assistance for Needy Families (TANF) program (formerly the Aid to Families with Dependent Children or AFDC program), the Medicaid program, and the State Children's Health Insurance Program (SCHIP). This also includes state public assistance programs."  Department of Justice, The National Voter Registration Act of 1993 (NVRA): Questions and Answers, *available at* http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php.

with yes/no checkboxes and several required statements; and provide applicants with the same degree of assistance in completing the voter registration application that they provide in completing the office's own forms.  42 U.S.C. § 1973gg-5(a)(6).

Congress considered Section 7 necessary to ensure the registration of "the poor and persons with disabilities who do not have driver's licenses and will not come into contact with the other principal place to register under this Act [motor vehicle agencies]." H.R. REP. NO. 103-66, at *19 (1993) (Conf. Rep.) (NVRA Conference Report); *see also,* 42 U.S.C. § 1973gg(b)(1).  As Congress recognized, because low-income citizens and citizens with disabilities are among those least likely to own motor vehicles, they are also the groups least able to take advantage of voter registration through other bureaucratic agencies that either are required to or voluntarily provide voter registration opportunities. As a result, any failure to implement the procedures required by Section 7 will have a disproportionate impact upon low-income citizens, who are entitled, under federal law, to register to vote at state-designated voter registration agencies.

### B.    PARTIES

Plaintiff Black Political Empowerment Project ("B-PEP") is a non-partisan community collaborative which was launched in 1986 with its principal place of business in Pittsburgh, Pennsylvania.  The organization's mission is to ensure that all African Americans are registered to vote and that they in fact vote in each and every election.   To effectuate this goal, B-PEP encourages voter registration and participation, particularly among minority and low-income citizens, and has committed and continues to commit time and personnel to conducting voter registration drives in Pennsylvania (including, for

example, conducting approximately 400 voter registration drives in Pennsylvania since 2008).   Those voter registration efforts focus on registering voters in low-income neighborhoods, including the registration of individuals who receive or apply for public assistance benefits.  Moreover, the voter registration efforts include updating the voter registration address of previously-registered voters who have moved.  *See* Ex. 7, Stevens Dec.

Plaintiff Pennsylvania Communities Organizing for Change, Inc., doing business as ACTION United ("ACTION United") is a not-for-profit corporation organized and existing under the laws of Pennsylvania, with its principal place of business in Philadelphia.  ACTION United has more than 52,000 members throughout the state of Pennsylvania, including members who receive and/or have applied and/or will apply for public assistance benefits through both the Department of Public Welfare and the Pennsylvania Department of Health.  ACTION United encourages voter registration and participation, particularly among minority and low-income citizens and has committed and continues to commit time and personnel to conducting voter registration drives in the state of Pennsylvania.  Currently, ACTION United is engaged in efforts to register its community members, who are typically low-income citizens, through door-to-door canvass and site-based voter registration events in low-income neighborhoods throughout Philadelphia and Pittsburgh.  This program is called "Voter Mobilizer."  ACTION United's voter registration efforts focus on registering voters in low-income neighborhoods, including the registration of individuals who receive or apply for public assistance benefits.  Moreover, the voter registration efforts include updating the voter

registration address of previously registered voters who have moved.  Although ACTION United encourages its members to vote, ACTION United has members who have applied and/or will apply for, and/or receive and/or will receive, public assistance benefits and who are not registered to vote or who will have moved since registering to vote without having updated their voter registration address.  *See* Ex. 8, Robbins Dec.

Defendants are responsible for implementing Section 7.  Defendant Carol Aichele is the Secretary of the Commonwealth of Pennsylvania.  Defendant Aichele is the chief elections official in the state of Pennsylvania and is responsible for overseeing the elections process.  In this capacity, she issues procedures for the return of completed voter registration applications; establishes and maintains a statewide qualified uniform voter file; and proposes rules, practices and procedures to the legislature to help implement laws regarding Pennsylvania elections.  *See* 25 Pa. Cons. Stat. Ann. § 1201; 25 Pa. Cons. Stat. Ann. § 2621.  The statutory provision implementing the NVRA and outlining the Department of State's responsibilities requires that the department shall "[p]rovide for applicants to submit their voter registration application to a commission, the Department of Transportation and other agencies designated in section 1325."  25 Pa. Cons. Stat. Ann. § 1201(1).  These agencies include "all offices in this Commonwealth that provide public assistance, each county clerk of orphans' court, including each marriage license bureau, all offices in this Commonwealth that provide State-funded programs primarily engaged in providing services to persons with disabilities and all armed forces recruitment centers."  25 Pa. Cons. Stat. Ann. § 1325(a).

Defendant Gary D. Alexander is the Secretary of the Department of Public Welfare ("DPW"), which is a voter registration agency per the NVRA and Pennsylvania law.  The DPW administers the following public assistance programs that, *inter alia*, are subject to the requirements of the NVRA:  Temporary Assistance for Needy Families (TANF), Supplemental Nutrition Assistance Program (SNAP or "food stamps"), State Emergency Relief, and Medicaid.

Defendant Dr. Eli N. Avila is the Secretary of the Department of Health ("DOH"), which is a voter registration agency per the NVRA and Pennsylvania law.  The DOH administers the Women, Infants, and Children ("WIC") program, which is subject to the requirements of the NVRA.

### C.   PENNSYLVANIA'S FAILURE TO COMPLY WITH THE VOTER REGISTRATION OBLIGATIONS UNDER THE NVRA[4]

#### 1.   Statistical Data

The Commonwealth's own reports to the U.S. Election Assistance Commission ("EAC") reveal that the Commonwealth public assistance offices submitted only 4,179 voter registration applications in the 2009-2010 reporting period.  *See* U.S. Election Assistance Comm'n, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2009-2010*, 39,  at Table 2.a. (June 30, 2011) ("2011 EAC Report"), attached hereto as Ex. 9.A.  This represents a 93 percent decline since 1995-1996, when the Commonwealth reported 59,462 registrations from

---

[4]  By separate motion, Plaintiffs seek an order for limited expedited discovery from the Court, and reserve the right to supplement the factual material provided herein based on the results of such discovery.

public assistance offices.  Fed. Election Comm'n, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office, 1995-1996*, at Table 2 (1997), attached hereto as Ex. 9.B.  This decline is particularly significant given that the number of initial food stamp applications in Pennsylvania during the same time frame nearly doubled, from 1,015,968 in 1995-1996 to 1,814,000 in 2009-2010.  *See* Ex. 6, Kim Dec., ¶¶ 5, 23.

Moreover, Pennsylvania's voter registration submission rates pale in comparison to those of other States with NVRA compliant programs.  For example, in 2009 and 2010, following entry of a preliminary injunction order directing state public assistance offices to comply with Section 7 of the NVRA, *see Association of Community Organizations for Reform Now, v. Scott*, No. 08-CV-4084, 2008 WL 2787931, at *19 (W.D. Mo. 2008), Missouri's public assistance agencies collected more than 120,000 voter registration applications, *see* Ex. 9.A., Table 2.a. — many times more than Pennsylvania collected during that period, even though Pennsylvania has twice Missouri's population.  In 2009 and 2010, following a lawsuit filed in 2006 and settled in 2009, *see Harkless v. Brunner*, Settlement Agreement, No. 1:06-CV-2284, (N.D. Ohio Nov. 25, 2009), Ex. 9.C. hereto, Ohio's public assistance agencies collected 246,923 voter registration forms, despite the fact that Ohio has a slightly smaller population and fewer food stamp applicants than Pennsylvania.  Ex. 9.A., Table 2.a.  This trend continued last year.  In 2011, 20 percent of all covered transactions in Missouri, and 40 percent of all covered transactions in Ohio, resulted in completed voter registration

transactions.   By contrast, in Pennsylvania, <u>only 0.2 percent of covered transactions</u> <u>resulted in completed voter registrations.</u>  *See* Ex. 6, Kim Dec., ¶ 6, 22.

Most recently, the Pennsylvania Department of State's June 2012 Voter Registration report, reveals staggering data that only further demonstrates the Commonwealth's clear and ongoing failure to comply with the NVRA:  the number of new voter registrations through public assistance agencies is unacceptably low.  The report maintains that 3,001,967 individuals received a voter preference form at County Assistance Offices (CAO) in 2011.  *See* Commonwealth of Pennsylvania Department of State, *The Administration of Voter Registration in Pennsylvania, 2011 Report to the General Assembly*, (June 2012), attached hereto as Ex. 9.D. at App. F.[5]  According to the report, even though 104,743 individuals had not declined to register to vote, only 5,498 individuals registered through a voter registration application provided by the offices.  *Id.* at App. F. and App. C; *see also* Ex. 6., Kim Dec., ¶¶ 18, 19.  The report also maintains that 350,483 individuals received the voter preference form at WIC offices in 2011.[6]  *Id.* Out of these individuals, the overwhelming majority – 221,503 – did not decline to register to vote.  *See id.*  Only 1,208 individuals, however, registered through a voter registration application provided by WIC.  *See id.*

These very low numbers of voter registration among public assistance clients in Pennsylvania is not because there is a high rate of registrations already among low-

---

[5]  Plaintiffs do not concede that this number is correct.

[6]  Plaintiffs do not concede the accuracy of this number.

income citizens.   Data from the United States Census Bureau indicates that the Commonwealth public assistance offices are not performing their voter registration obligations under the NVRA.   According to the Census Bureau's November 2010 Current Population Survey, only 53.6% of eligible low-income Pennsylvania citizens were registered to vote compared to 79.7% of high income voters were on the rolls.  *See* Ex. 6, Kim Dec., ¶ 17.

### 2.    Investigation Results

Recent interviews with clients and workers at public assistance offices confirm that the Commonwealth's public assistance offices regularly fail to offer voter registration.  Between February 27, 2012 and March 2, 2012, Sabrina Khan investigated nine public assistance offices in Allegheny, Beaver, Washington, Delaware, and Philadelphia Counties.   Ex. 1, Khan Dec., ¶ 2.   She completed interviews with 49 individuals at 7 of those offices.  Ex. 1, Khan Dec., ¶¶ 3, 5, 6, 8, 9, 10, 12, 13.  Of those 49 individuals, four checked "yes" to the question asking if they wished to register to vote, but were not given a voter registration application; six remembered leaving the voter preference question blank, but were not given a voter registration application; and ten did not remember seeing the voter preference question (which would imply that they left it blank), were not orally asked if they wished to register, and were not given a voter registration application. Ex. 1, Khan Dec., ¶¶ 5(b), 6(b), 8(b), 9(b), 10(b), 12(b), 13(b). Thus, 20 out of 49 individuals (or just under 40%) had transactions that did not comply with Section 7.

Further investigations were conducted in April, 2012 by Lorraine Cook, Angel Gober, Robert Glidden, and La'Tasha Mayes.  Collectively, they investigated ten public assistance offices in Berks, Lackawanna, Erie, Allegheny, and Beaver Counties.  Ex. 2, Cook Dec., ¶ 2; Ex. 3, Gober Dec. ¶ 2; Ex. 4, Glidden Dec., ¶ 2; Ex. 5, Mayes Dec., ¶ 2.[7] Of the 59 interviews that they completed, two people checked "yes" to the voter preference question and were given voter registration applications, but received no assistance in completing the applications.  Ex. 4, Glidden Dec., ¶ 5(b); Ex. 5, Mayes Dec., ¶ 5(b).  One person remembered leaving the voter preference question blank and was not given a voter registration application.  Ex. 5, Mayes Dec., ¶ 5(c).  Thirty-one people indicated that they did not remember seeing a voter preference question (which would imply that they left it blank), were not orally asked if they wanted to register to vote, and were not given a voter registration application.  Ex. 2, Cook Dec., ¶¶ 5(b), 6(b), 7(b), 8(b); Ex. 3, Gober Dec. ¶¶ 4(a), 5(a), 6(a), 7(a); Ex. 4, Glidden Dec., ¶ 5(c); Ex. 5, Mayes Dec., ¶¶ 5(d), 6(d), 7(b).

Shockingly, one person reported that she wanted to register to vote, but the WIC employee told her to skip the voter registration question and not to mark anything in the "voter space," and did not provide the client with a voter registration application.  Ex. 3, Gober Dec., ¶ 5(b).  Two people were told that they could not apply for benefits at a DPW Erie office, and were turned away without being offered voter registration.  Ex. 4, Glidden Dec., ¶ 5(c).

---

[7]  Ms. Gober and Ms. Mayes separately visited the same four offices.  Ex. 3, Gober Dec., ¶¶ 4, 5, 6, 7; Ex. 5, Mayes Dec., ¶¶ 5, 6, 7, 8.

Most recently, between July 17 and July 19, 2012, investigators obtained eleven declarations from persons engaging in covered transactions at DPW and DOH offices in Philadelphia and Chester.[8]  *See* Exs. 10-20.  Nine declarations were obtained at DPW offices, while the other two were obtained at DOH offices.  *See id.*  Ten persons declared under penalty of perjury that they did not see a voter preference question, were not orally asked if they wanted to register to vote, and did not receive a voter registration application.  *See* Exs. 10-11, 13-20.  One person declared under penalty of perjury that she checked "yes" to the voter preference question but was not given a voter registration application.  See Ex. 12.  Importantly, three of the eleven were eligible to vote but not registered to vote at their current address.  *See* Exs. 10, 12, 14.  Thus, they not only experienced a non-compliant transaction, but were also harmed by the non-compliant transaction.

Observations inside the public assistance offices and conversations with agency employees provided further evidence of the agencies' failures to properly offer voter registration.  Two of the sites visited in February, Philadelphia's South District WIC and Allegheny County's Three Rivers District DPW, had no voter registration applications on site at all.  In the Philadelphia office, the clerk stated that they had some voter registration applications, a "few months ago." *See* Ex. 1, Khan Dec., ¶¶ 5(a), 11(a).  In the majority of the offices visited, clerks stated that voter registration applications are provided only to

---

[8]  To protect the privacy of the individuals who signed declarations, their names and addresses have been redacted from the copies attached hereto.  Unredacted copies can be made available to the Court upon request.

clients who check "Yes" in response to the question whether they "would . . . like to register to vote here today," despite the NVRA requirement that all persons engaging in covered transactions receive a voter registration application unless they specifically decline, in writing, to receive such an application.   *See* Ex. 6, Kim Dec., ¶ 10.   Finally, only 24% of the sites (4 of 17) visited had signs posted informing people they could register to vote, and only 6% of the sites (1 of 17) displayed instructions on how to register to vote.   *See* Ex. 6, Kim Dec., ¶ 16.

### D.   PRE-LITIGATION NOTICE OF SECTION 7 VIOLATIONS

On April 23, 2012, counsel for Plaintiffs on behalf of the Black Political Empowerment Project, "persons eligible to register to vote who they represent, and others similarly situated" sent a letter to Defendant Aichele notifying her of the NVRA violations.   The letter stated that, in the absence of a plan to remedy Pennsylvania's failure to implement the NVRA, Plaintiffs would have no choice but to commence litigation.   *See* Ex. 9.E.   Defendants Alexander and Avila were sent a copy of the notice on the same day.   The violations of the NVRA described in the notice letter have not been remedied.

The evidence demonstrates that Defendants, who are collectively charged with responsibility for the Commonwealth's compliance with the NVRA, have failed and continue to fail to ensure that the Commonwealth fulfills its duties as mandated by Section 7.   Specifically, public assistance offices are not providing applicants, or those re-certifying or changing an address for public assistance benefits, the opportunity to register to vote as the NVRA requires.   Defendants' failure to implement the NVRA has

deprived countless eligible voters of the opportunity to register and will deprive thousands more of that opportunity unless enjoined.

Accordingly, Plaintiffs seek injunctive relief to ensure that the Commonwealth with Section 7, and that the fundamental right to vote of every Commonwealth citizen is protected.

## III.  ARGUMENT

To obtain a preliminary injunction, Plaintiffs must demonstrate : 1) a likelihood of success on the merits; 2) that they will suffer irreparable harm if the injunction is denied; 3) granting relief will not result in even greater harm to the nonmoving party; and 4) the public interest favors such relief.  *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (quoting *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010)).  Here, Plaintiffs easily satisfy each of these factors based on the clear evidence that Defendants have violated and are continuing to violate the public assistance agency requirements of Section 7.

### A.  DEFENDANTS' ONGOING VIOLATIONS OF SECTION 7 ESTABLISH THAT PLAINTIFFS HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS

NVRA Section 7 requires that during each covered transaction, the public assistance agency:

(A) distribute [a voter registration form] with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance . . . unless the applicant, in writing, declines to register to vote;

(B) provide a form [referred to as a "voter preference form"] that includes -

(i)   the question [referred to as a "voter preference question"], "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

(ii)  if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

(iii) boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type). "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.";

(iv)  the statement, "If you would like help in filling out the voter registration application form, we will help you.  The decision whether to seek or accept help is yours.  You may fill out the application form in private."; and

(v)   the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _____ .", the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed; and

(C)  provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

42 U.S.C. § 1973gg-5(a)(6).

As discussed below, Defendants have violated and are continuing to violate these requirements, demonstrating that Plaintiffs have a likelihood of success on the merits.

### 1.    Defendants' Voter Preference Forms Do Not Comply with Section 7

Defendants do not comply with Section 7's requirement to offer voter preference forms that comply with the requirements of 42 U.S.C. § 1973gg-5(a)(6)(B).  Specifically, Department of Public Welfare benefits applications do not include the statutorily required language with the offer of voter registration.  For example, of three benefits applications collected recently at DPW offices, all of them were missing one of the required statements and one was missing three of the required statements.   *See* Ex. 9.F, Pennsylvania Department of Public Welfare Benefits Review; Ex. 9.G, Pennsylvania Application for Benefits; Ex. 9.H, Pennsylvania Application for Food Stamps.  Section 7 is very explicit that during every covered transactions, all clients and applicants must be asked the question "[i[f you are not registered to vote where you live now, would you like to apply to register to vote here today?" and that all the accompanying disclaimer language be provided.  *See* 42 U.S.C. § 1973gg-5(a)(6)(B).  As the attached benefits applications establish, Defendants are clearly not complying with this requirement of Section 7.

Moreover, the location and presentation of the voter preference question in the various Pennsylvania benefits applications make it unlikely that applicants will see or complete the voter registration question.  The question appears on page 8 of the Food Stamps applications under the heading, "Voter Registration (for County Assistance Office Use)."  Ex. 9.H.  Such a heading would lead a reasonable applicant to ignore the section based on the belief that they were not expected or permitted to fill it in.  Indeed,

interviews with public assistance clients revealed that 40% of interviewees (32 out of 80) did not notice the voter registration question within the forms they were provided at DPW offices.   At WIC, 62% of clients (16 out of 26) did not see a question about voter registration on any of the forms. *See* Ex. 6, Kim Dec., ¶ 9.[9]

### 2.   Defendants Fail to Offer Voter Registration to Public Assistance Clients, Even to Clients Who Affirmatively Request Them

Public assistance agencies throughout the Commonwealth have failed and continue to fail to ensure that all clients who apply, recertify, renew, or change an address in connection with public assistance benefits are provided with a voter preference form, a voter registration application form, and assistance in completing a voter registration application form.  42 U.S.C. § 1973gg-5(a)(6)(A).

The evidence establishes that even when a client indicates that he or she would like to register to vote, they often are not provided with a voter registration application – a clear violation of Section 7.  Clients in Pittsburgh, Chester, and Philadelphia reported that they had checked "yes" to the voter preference question but were not given voter registration applications.  *See* Ex. 1, Khan Dec., ¶¶ 5(b), 9(b), 10(b), 12(b).  Statewide, of the public assistance clients interviewed who had checked "yes," 50% (4 of 8) were not given an application.  *See* Ex. 6, Kim Dec., ¶ 15.   In addition to this evidence obtained during the recent surveys conducted in various locations in the Commonwealth, one of the recently collected Declarations is from a WIC client who was seeking to renew

---

[9]  Investigators were unable to obtain copies of the WIC forms.  Plaintiffs will seek these forms through discovery and supplement this preliminary injunction motion as appropriate.

benefits and specifically recalled checking "yes" to the voter benefits question on her renewal application. *See* Ex. 12. But as she attests to in her Declaration, she was not provided with a voter registration application.

Moreover, at least two at least two of the sites visited, Philadelphia's South District WIC and Allegheny County's Three Rivers District DPW, had no voter registration applications on site at all. In the Philadelphia office, the clerk stated that they had some registration applications a "few months ago." *See* Ex. 1, Khan Dec., ¶¶ 5(a), 11(a). The events described in the declarations constitute clear evidence of Defendants' consistent, ongoing failure to fulfill their federally mandated obligations under Section 7 of the NVRA. They are thus not only unable to provide applications to clients who check "Yes" in answer to the voter preference question as required by 42 U.S.C. § 1973gg-5(a)(6), but they are also unable to provide applications to *any* person who comes into the office as required by 42 U.S.C. § 1973gg-5(a)(4). The events described in the declarations constitute clear evidence of Defendants' consistent, ongoing failure to fulfill their federally mandated obligations under Section 7 of the NVRA.

### 3. Defendants Fail to Distribute Voter Registration Applications to Clients Who Leave the Voter Preference Question Blank

Subsection (a)(6)(A) of Section 7 requires public assistance agencies "to distribute [a voter registration form] with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance . . . <u>unless the applicant, in writing, declines to register to vote</u>." 42 U.S.C. § 1973gg-5(a)(6)(A) (emphasis added). Under the plain language of this provision,

21

clients must affirmatively "opt out" of receiving a voter registration application *in writing*.  Unless the applicant does so, the agency must provide the registration form at the same time it engages in the public assistance transaction.

The Commonwealth violates this requirement.   Rather than automatically distributing the registration form unless the applicant declines the form in writing, as Section 7 requires, the Commonwealth's policy and practice is for agencies to withhold voter registration forms unless the applicant makes an affirmative written request for a registration form.  By shifting to the applicant the burden of making an affirmative written request for a registration form, the Commonwealth deprives countless applicants of the registration forms to which they are entitled under Section 7.

The Commonwealth appears to base its policy and practice with respect to distribution of the registration forms on a misreading of the separate requirements of Section 7 relating to the "voter preference form" (set forth in subsection (a)(6)(B)) and to assistance in completing the registration form (set forth in subsection (a)(6)(C)).  Under subsection (a)(6)(B)(iii), the voter preference form must include:

> boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type) "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME."

42 U.S.C. § 1973gg-5(a)(6)(B)(iii).   Under this subsection, if the applicant fails to indicate on the voter preference form whether he or she would like to register or declines to register, the non-response may be "deemed to constitute a declination to register <u>for</u>

22

purposes of subparagraph (C)."  Id. (emphasis added).  However, subparagraph (C) only

addresses the agency's duty to provide the applicant with assistance in completing the

voter registration form.  Nothing in Section 7 states or suggests that the applicant's

failure to check a box on the voter preference form affects the applicant's right under

subparagraph (A) to distribution of the voter registration form itself.  The failure to

check a box is not a declination "in writing" as required by subparagraph (A).[10]

Further, the very fact that Section 7 limits the effect of a non-answer to assistance under

subparagraph (C) confirms it was not intended to apply to the distribution of registration

forms under subparagraph (A).

      The case law to date is consistent with this analysis.  The 10th Circuit's decision in

Valdez v. Squier, 676 F.3d 935 (10th Cir. 2012), specifically holds that the NVRA

requires states to provide voter registration applications to individuals who leave the

voter preference question blank.  As the Tenth Circuit explained, "[i]f an applicant is

passive, i.e., does not check either the "YES" or "NO" box on the declination form and

thereby indicate his or her intent in writing, [a public assistance office] must, in

accordance with the mandate of subsection (A), still provide him or her with a voter

registration form . . . ." Id. at 947; see also Nat'l Coal. for Students with Disabilities

---

[10]  The phrase "in writing," should be given its ordinary meaning. Perrin v. United States, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."); Hamilton v. United Healthcare of Louisiana, Inc., 310 F.3d 385, 391 (5th Cir. 2002) ("A fundamental canon of statutory construction instructs that in the absence of a statutory definition, we give terms their ordinary meaning.").  Black's Law Dictionary defines "writing" as "any intentional recording of words that may be viewed or heard with or without mechanical aids." Black's Law Dictionary at 1748 (9th ed. 2009).

*Educ. & Legal Def. Fund v. Scales*, 150 F. Supp. 2d 845, 853-54 (D. Md. 2001) (rejecting the claim that persons protected by Section 7 of the NVRA may be required to affirmatively request a voter registration application in order for it to be provided). Similarly, while not reaching the issue directly, the U.S. District Court for the Northern District of Georgia stated that if the state interprets a blank response as a no and does not offer a voter registration application, that "likely runs afoul of Section 7." *Ga. State Conference of NAACP v. Kemp*, No. 11-CV-1849, 2012 WL 265925, at *9 (N.D. Ga. Jan. 30, 2012).

The evidence demonstrates that the Commonwealth violates subparagraph (a)(6)(A). "Pennsylvania's Guide to Agency-Based Voter Registration Programs" provides a variety of instructions to public assistance agencies regarding voter registration. *See* Pennsylvania Department of State Bureau of Commissions, Elections & Legislation, *Pennsylvania's Guide to Agency-Based Voter Registration Programs* 8 (2009), attached hereto as Ex. 9.I. The Guide states: "If a client refuses to mark any boxes or otherwise complete the form, you may consider the refusal to be a decision not to apply to register to vote at this time and must note this on the Preference Form." *Id.* at 8. According to the Guide, the voter registration packet may only be provided if the client affirmatively checks the "Yes" box on the preference form. *Id.*

Interviews with Defendants' employees and clients indicate that public assistance agencies operate in conformance with the Guide's inaccurate instructions. In spot-checks of the Department of Public Welfare and Department of Health offices, clerks stated that voter registration applications are provided only to benefits applicants who check "Yes"

in response to the questions whether they "would . . . like to register to vote here today." *See* Ex. 1, Khan Dec., ¶ 5(a), Ex. 2, Cook Dec. ¶ 5(a); Ex. 6, Kim Dec. ¶ 10.

In Berks County, two public assistance clients who were interviewed at a DPW office in Reading indicated that they had not been asked about voter registration and they did not see a voter registration question in their benefits application, which would necessarily mean that they did not answer the question. Neither of these interviewees received a voter registration application. *See* Ex. 3, Gober Dec., ¶¶ 6(a), 7(a). Similarly, at a WIC office in Berks County, a public assistance client who was interviewed was not asked orally about voter registration, did not see the voter registration question in the printed materials, and did not receive a voter registration application, again suggesting that they left any voter preference question blank. *See* Ex. 3, Gober Dec., ¶ 7(a).

In Delaware County, at least four of the individuals interviewed at a DPW office in Chester were not asked about voter registration while engaging in a covered transaction. Two of these individuals did not recall seeing any voter prefer questions and one individual specifically recalled leaving this question blank. None of them were provided with voter registration applications. *See* Ex. 1, Khan Dec., ¶ 9(b); Ex. 6. Kim Dec. ¶ 12.

In Philadelphia, another five clients did not answer the voter preference question and were not provided with voter registration applications. *See* Ex. 1, Khan Dec., ¶¶ 10(b), 12(b), 13. Additionally, just this last week, Plaintiffs collected Declarations from another 10 individuals who did not recall seeing or answering the voter preference question and were not asked about or provided with voter registration applications. *See*

Exs. 10-11, 13-20.  These individuals also presumably left any voter preference questions in their benefits applications blank, and therefore, the failure of Defendants to provide them with voter registration applications violates Section 7.

Defendants are clearly failing to inquire whether persons who leave the voter preference question blank wish to register.  Of the 59 people interviewed during the surveys who left the voter preference question blank state-wide, only eleven were orally asked by any DPW or DOH employees about voter registration and only one received a voter registration application.  *See* Ex. 6, Kim Dec., ¶ 14.

Thus, the evidence establishes that as a matter of policy as articulated in the Pennsylvania Guide, as well as practice, Pennsylvania public assistance agencies violate Section 7's requirement that they provide voter registration forms to applicants, unless the applicant expressly declines in writing to register to vote.

Plaintiffs' investigation also reveals that Defendants' violations of this requirement may be attributable in whole or in part to a Pennsylvania statute, 25 Pa. Cons. Stat. Ann. § 1325.  This statute sets forth Pennsylvania's implementation of the public assistance agency requirements of NVRA Section 7.  The statute borrows almost verbatim the language of subparagraph (a)(6)(B)(iii) relating to the effect of unchecked boxes on the voter preference form.  25 Pa. Cons. Stat. Ann. § 1325(b)(3).  Unlike Section 7, however, 25 Pa. Cons. Stat. Ann. § 1325(b)(3) fails to explain that an unchecked box is only relevant to the requirement that the agency provide the applicant with assistance in completing the voter registration form, and does not excuse the agency from providing the applicant with a copy of the registration form itself.  This problem is

compounded by 25 Pa. Cons. Stat. Ann. § 1325(c), which incorrectly provides that "[f]ailure to check either box . . . shall be considered a declination to register to vote." Nothing in the Pennsylvania statute makes clear that, as provided by Section 7 of the NVRA, a failure to complete the voter preference form does not trump the public assistance agency's independent obligation to distribute the voter registration form unless the applicant "declines" the form "in writing." 42 U.S.C. § 1973gg-5(a)(6)(A).

Thus, insofar as the language of the Pennsylvania Guide or Defendants' other violations of Section 7 are attributable or whole or in part to the modifications of the Section 7's requirements that appear in 25 Pa. Cons. Stat. Ann. § 1325(b) or (c), these provisions of state law must yield to the express requirements of Section 7. *See Project Vote/Voting for America, Inc. v. Long*, 813 F.Supp.2d 738, 741, 745 (E.D. Va. 2011); *see also Gonzalez v. Arizona*, 677 F.3d 383, 392-93 (9th Cir. 2012) (holding that Arizona statute was superseded by the NVRA under the Elections Clause). At a minimum, as part of the relief requested herein, the Court should enjoin Defendants from applying or interpreting state law in a way that conflicts with the NVRA's requirements.

### 4.   Defendants Have Failed to Offer Equal Assistance

Defendants have failed to offer equal assistance under Section 7 of the NVRA. The NVRA specifically requires that a voter registration agency, "provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance." 42 U.S.C. § 1973gg-5(a)(6)(C). Because 50% of the public assistance clients

who checked "yes" were not given a voter registration application, they necessarily could not have been provided with equal assistance in completing it.

In the Erie County Department of Public Welfare office, two applicants for public assistance were told that all initial applications must be made via computer at home or at another place with computer access such as a library.   Neither were offered voter registration services.   *See* Ex. 4, Glidden Dec., ¶ 5(c).   The failure of these Commonwealth public agencies to provide equal assistance is a facial violation of the NVRA and thus, Plaintiffs have clearly demonstrated a likelihood of success on the merits of their claims.

In sum, for all of the reasons set forth in Sections III.A.1 to 4 above, Plaintiffs have established a likelihood of success on the merits.

**B.     ABSENT AN INJUNCTION, DEFENDANTS' VIOLATIONS OF SECTION 7 WILL CAUSE PLAINTIFFS IRREPARABLE HARM**

Plaintiffs also readily satisfy the irreparable harm requirement.   The clear evidence that Defendants are violating Section 7, and the underlying purpose of Section 7 — to ensure that low-income eligible voters are given the opportunity to register to vote when they come into contact with public assistance agencies — establish that those violations will cause irreparable harm absent an injunction.

Where Congress expressly provides for injunctive relief to prevent violations of a federal statute, a plaintiff need not demonstrate irreparable harm to obtain a preliminary injunction.   *ReMed Recovery Care Centers v. Township of Willistown,* 36 F. Supp. 2d 676, 688 (E.D. Pa. 1999) (holding that, due to the nature of housing discrimination, a

violation of Fair Housing Amendments Act creates a presumption of irreparable harm) (citing *Rosa v. Resolution Trust Corp.,* 938 F.2d 383, 400 (3d. Cir. 1991).[11]  The Third Circuit has not ruled on whether an NVRA violation gives rise to a presumption of irreparable harm.  However, the NVRA expressly provides that a private party may "bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to [a violation of the NVRA]."  42 U.S.C. § 1973gg-9(b)(2).

Further, a number of courts in other jurisdictions have granted injunctive relief under the NVRA based on evidence showing violations of the NVRA, including Section 7.  *See, e.g.*, *Charles H. Wesley Educ. Found, Inc. v. Cox,* 408 F.3d 1349 (11th Cir. 2005); *Association of Community Organizations for Reform Now v. Miller,* 912 F. Supp. 989, 990 (W.D. Mich. 1996) (ordering prompt compliance with NVRA requirements), *aff'd,* 129 F.3d 833 (6th Cir. 1997); *ACORN v. Scott*, 2008 WL 2787931, at *8 (entering injunction requiring pre-election remedial plan to correct violations of Section 7 of NVRA); *Project Vote v. Blackwell,* 455 F. Supp. 2d 694, 709 (N.D. Ohio 2006); *NCSD Educ. & Legal Def. Fund,* 150 F. Supp. 2d at 856  (determining injunctive relief an appropriate remedy); *Wilson v. United States*, 878 F. Supp. 1324, 1328-29 (N.D. Cal. 1995).  That approach is justified because Congress has already "balanced the equities" in the NVRA and "has determined that, as a matter of public policy," violations of the

---

[11]  This Court in *Association of Community Organizations for Reform Now v. Ridge*, No. 94-7671, 1995 WL 136913, at *8 (E.D. Pa. 1995), declined to apply a presumption of irreparable harm to an NVRA violation, noting that "Congress could have provided a provision to the effect that a court shall enter an injunction upon showing that the Act was violated, but no such provision exists in the NVRA."  However, as indicated by this Court's subsequent decision in *ReMed* and the cases cited therein, courts in this Circuit will recognize a presumption of irreparable harm even if the absence of such mandatory statutory language.

statute should be remedied or prevented by injunctive relief.  *Burlington N. R.R. Co. v. Bair*, 957 F.2d 599, 603 (8th Cir. 1992); *see* 42 U.S.C. § 1973gg-9(b)(2) (providing for private action for declaratory or injunctive relief with respect to the violation).

Therefore, because the NVRA expressly provides that violations may be remedied by injunctive relief, 42 U.S.C. § 1973gg-9(b)(2), and because the NVRA and Section 7 in particular are designed to protect the public and to increase opportunities for voter registration, Defendants' violations should be held to give rise to a presumption of irreparable harm.

In any event, whether or not the presumption of irreparable harm applies, Plaintiffs plainly have demonstrated it.  The Supreme Court has long held that voting is among the most fundamental rights granted to United States citizens.  "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined."  *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964); *see also Reynolds v. Sims,* 377 U.S. 533, 560 (1964); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (voting "is regarded as a fundamental political right, because preservative of all rights").  As such, the interference with the right to vote constitutes irreparable harm.  *See, e.g.*, *Council of Alt. Political Parties v. Hooks*, 121 F.3d 876, 883-884 (3d Cir. 1997); *United States v. Berks Cnty., Pa.,* 277 F. Supp. 2d 570, 582 (E.D. Pa. 2003); *Coleman v. Bd. of Educ. of City of Mount Vernon,* 990 F. Supp. 221, 226 (S.D.N.Y. 1997) ("The deprivation or dilution of voting rights constitutes irreparable harm."); *Puerto Rican Legal Def. and Educ. Fund, Inc. v. City of New York,*

30

769 F. Supp. 74, 79 (E.D.N.Y. 1991) ("it is well-settled that the claimed deprivation of a constitutional right such as the right to a meaningful vote or to the full and effective participation in the political process is in and of itself irreparable harm.").

Congress echoed this sentiment in the language of the NVRA: "The Congress finds that— (1) the right of citizens of the United States to vote is a fundamental right; (2) it is the *duty* of the Federal, State, and local governments to *promote* the exercise of that right . . . ." 42 U.S.C. § 1973gg(a)(1)-(2) (emphasis added).  The purpose of the NVRA was to remove barriers to voter registration, and therefore to voting itself. Section 7 of the NVRA makes it easier for low-income citizens to become registered to vote.  The repeated and continuing failure by Defendants to abide by the requirements of Section 7 causes irreparable harm to Plaintiffs and to low-income Commonwealth citizens, who, because of Defendants' violations of federal law, face an additional burden on their right to vote – a burden the NVRA was specifically intended to remove.

The denial of the fundamental right to vote cannot be compensated by an action at law for money damages.  Further, any remedy that requires delay until the likely conclusion of this litigation will be inadequate.  Such a delay will deprive hundreds of thousands of Commonwealth citizens of the registration opportunities to which they are entitled under Section 7, and will certainly result in many of them not being registered to vote in the November 2012 election.  This is especially the case because many

beneficiaries of the programs implicated by Section 7, such as SNAP, recertify for their benefit programs only once every six months.[12]

Every election is uniquely historic and uniquely important. The inability to participate in an election cannot be compensated after the fact, or assuaged by the ability to participate in the next.  Without the preliminary injunctive relief Plaintiffs seek, therefore, irreparable harm will be the inevitable result.

The Declarants interviewed are recipients of public assistance benefits who are not registered to vote, or are not registered at their current address.  *See* Exs. 10, 12, 14. (Three of the Declarations collected in July 2012 from clients of the Defendants were from individuals who are not currently registered to vote, including one Declaration from an individual seeking WIC benefits from DOH and another individual seeking SNAP benefits from DPW).  These individuals should be offered the opportunity to register to vote each time they apply or recertify for public assistance benefits.  It is clear, however, that Defendants have failed to follow the NVRA's requirements under Section 7.  As a result, individuals who receive public benefits, including members of the Plaintiff ACTION United, are not being offered the opportunity to register when they apply or recertify for benefits.

In addition, Plaintiffs, B-PEP and ACTION United, continue to suffer harm in their own rights as a result of Defendants' failure to adhere to Section 7.  Due to

---

[12]   *See* Division of Welfare and Supportive Services, Application Processing, ELIGIBILITY AND PAYMENTS MANUAL § 162 (Mar. 1, 2011), *available at* https://dwss.nv.gov/dmdocuments/EP_Man_A-0100.pdf, attached hereto as Ex. 9.J.

Defendants' failure, Plaintiffs must devote their own resources to voter registration assistance efforts for their members and other low-income members of the community. *See Fla. State Conference of NAACP v. Browning,* No. 07-15932, 2008 U.S. App. LEXIS 7100, *34-36 (11th Cir. Apr. 3, 2008) (organizations alleging violation of Help America Vote Act established standing based on proof that responding to Florida third-party registration law diverted resources from voter registration drives and election day monitoring); *Ga. State Conference of NAACP,* 2012 WL 265925, at *9 (organization was sufficiently injured by expending time and resources to register voters who should have been offered registration through public assistance agencies).  As such, the continuing failure of DPW and DOH to offer voter registration opportunities as required by the NVRA has required Plaintiffs to expend resources they would not otherwise have expended, thereby diverting resources Plaintiffs need for community organization, issues campaigns, and other programs in order to realize full achievement of their goals. Defendants' failure to abide by the requirements of the NVRA, therefore, has hampered and impeded Plaintiffs' missions, and continues to cause Plaintiffs irreparable harm. Plaintiffs have demonstrated Defendants' widespread and repeated violation of the NVRA and the injuries Defendants' failures have inflicted upon Plaintiffs – namely, Plaintiffs must spend their own limited time and funds on voter registration efforts that should have already been undertaken by the public assistance offices.

Here, violations of the NVRA not only have occurred, but absent injunctive relief, undoubtedly will recur.  *See* Exs. 10-20.  (The Declarations attached hereto show that as recently as last week, July 17-19, 2012, 11 individuals were not offered the right to vote

as required by Section 7 at the Defendants' offices.)  Defendants' violations of the NVRA are not merely technical; rather, the failure to provide those clients of DPW and DOH the opportunity to register to vote during covered transactions violates the very purpose of the NVRA.

Plaintiffs submit that, for all the reasons discussed above, their showing of repeated and ongoing substantive violations of Section 7 establishes irreparable harm.

### C.    GRANTING RELIEF WILL NOT RESULT IN EVEN GREATER HARM TO THE DEFENDANTS

As demonstrated above, if the Court does not grant preliminary injunctive relief, Plaintiffs and their members will suffer significant irreparable harm, namely, deprivation of the opportunity to register to vote as contemplated by Congress when it passed the NVRA.   If an injunction is not granted, hundreds of thousands of low-income Commonwealth citizens will lose the opportunity to register, and therefore to vote, in the upcoming November elections.   In addition, Plaintiffs will be forced to spend a significant portion of their limited time and resources assisting low-income voters with registering to vote, expenditures that would be unnecessary were Defendants complying with their obligations under the NVRA.

In contrast, to the extent Defendants suffer any burden if the injunction is granted, it is a burden – compliance with the NVRA – that has been mandated by Congress, and must be accepted.  *See, e.g.*, *Charles H. Wesley Educ. Found,* 324 F. Supp. 2d at 1368 (NVRA required acceptance of bundled mail-in voter registrations), *aff'd,* 408 F.3d 1349 (11th Cir. 2005).  In any event, any expense incurred by Defendants in complying with

the NVRA is greatly outweighed by the fundamental rights of Commonwealth citizens that an injunction would protect. *See Berks Cnty.,* 277 F. Supp. 2d at 582 ("Defendants will not suffer irreparable harm if a permanent injunction is issued.  Any small additional monetary expense to Defendants to conduct the election in compliance with the Voting Rights Act is far outweighed by the important fundamental right involved in this case."). Therefore, issuing a preliminary injunction will not result in even greater harm to Defendants.

### D.   THE PUBLIC INTEREST FAVORS SUCH RELIEF

Courts must consider the public interest in any injunctive action in which the public interest is affected, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982), and it must be given substantial weight.  *See, e.g.*, *Yakus v. United States,* 321 U.S. 414 (1944).  Furthermore, "[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights" including voting rights, particularly where there is no basis for concluding that preliminary relief will negatively impact an upcoming election.  *Council of Alt. Political Parties*, 121 F.3d at 883-84. Here, it is clear that the public interest favors granting Plaintiffs' motion for a preliminary injunction.  The voting rights of hundreds of thousands of Commonwealth citizens are at stake.  The language of the NVRA itself makes clear where Congress stands on the question of public interest: "The Congress finds that— (1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right . . . ." 42 U.S.C. § 1973gg(a)(1)-(2).   The public interest is best served by an injunction that ensures that the

Commonwealth "stays true to the avowed *national* interests embodied within the National Voter Registration Act of 1993." *Blackwell,* 455 F. Supp. 2d at 708 (emphasis in original).

The injunctive relief Plaintiffs seek requires only that the Commonwealth and its public assistance agencies comply with Section 7 to prevent future harm and remediate clear past violations of the NVRA. In comparison to the paramount importance of the right to vote, the additional expenditure of money or resources an injunction would require would be insubstantial. Therefore, any opposition to the injunctive relief sought here would not be in the public interest. It is clear, then, that the significant public interests involved in this case weigh entirely in favor of granting an injunction.

### E.    RELIEF REQUESTED

In view of Defendants' wide-spread and ongoing violations of Section 7, Plaintiffs are entitled to comprehensive injunctive relief to ensure that Defendants fully comply with all applicable requirements of Section 7 pending a full trial on the merits. In particular, Plaintiffs request that this Court enter a preliminary injunction order providing as follows:

1.      Commencing on or before 5 business days after entry of this Order, Defendants shall ensure that each agency providing service or assistance ("public service agency") provide, with each application for such service or assistance, and with each recertification, renewal or change of address form relating to such service or assistance (a "covered transaction"), a form ("voter preference form") that conspicuously includes:

**(i)** the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

**(ii)** if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

**(iii)** boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.";

**(iv)** the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and

**(v)** the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with XXXXX.", the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed.

2.      Commencing 5 business days after entry of this Order, Defendants shall ensure that each public assistance agency provides, with each covered transaction, a voter registration mail application or the agency's own equivalent application, unless the applicant, in writing, declines to register to vote.

3.      Commencing 5 business days after entry of this Order, Defendants shall ensure that a sufficient supply of registration forms and voter preference forms are available for distribution at each DPW and DOH office in the Commonwealth of Pennsylvania for distribution to DPW and DOH applicants and clients.

4.     On or before 5 business days after entry of this Order, Defendants shall publish an amended version of Pennsylvania's Guide to Agency-Based Voter Registration Programs (the "Guide"), which revises items 4 and 5 on page 8 of the Guide as follows:

> 4.     If the client does not want to register to vote, ask him/her to mark the "No" box and have him/her sign and date the Preference Form. If the client is already registered to vote, have him/her also mark the box "No, I am already registered to vote where I live now." If the client refuses to mark any boxes, **you must still provide the client with a voter registration mail application form.** ~~or otherwise complete the form, you may consider the refusal to be a decision not to apply to register to vote at this time and must note this on the Preference Form along with the client's name and address.~~

> 5.     If the client wants to register to vote, ask him/her to mark the "Yes" box and to sign and date the Preference Form. You **must** ~~may~~ then give the client a voter registration mail application form **and offer to assist the client in completing the form**.

5.     On or before 5 business days after entry of this Order, Defendants shall modify any other written policies which provide instructions similar to items 4 and 5 on page 8 of the Guide in a manner consistent with paragraph 4 above.

6.     Defendants are enjoined from interpreting or applying, or permitting any public assistance agency to interpret or apply, 25 Pa. Cons. Stat. Ann. § 1325 in a manner that would permit public assistance agencies to fail to provide voter registration forms to applicants who fail to complete the voter preference form or any portion thereof.

7.     Commencing on or before 5 business days after entry of this Order, Defendants shall ensure that each public assistance agency provides to each applicant who does not decline in writing to register to vote the same degree of assistance with

regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

8.     Commencing on or before 5 business days after entry of this Order, Defendants shall ensure that public assistance agencies accept completed voter registration forms and forward them to the appropriate election official within 10 days of receipt or, if received within 5 days before the last day for registration to vote in an election, not later than 5 days after receipt.

9.     On or before 5 business days after entry from the date of this Order, Defendants shall (a) designate a representative in the office of the Secretary of the Commonwealth who will serve as Commonwealth NVRA coordinator and (b) shall designate an NVRA Site Coordinator for each DPW and DOH office, who shall be responsible for ensuring the office's compliance with the requirements of this Order.

10.     On or before 5 business days after entry of this Order, the Defendants shall notify the Commonwealth NVRA Coordinator and each NVRA Site Coordinator of his or her obligations under the NVRA and this Order, and obtain written acknowledgment from each such Coordinator that he or she has read and understands those obligations.

11.     Defendants shall ensure that, on or before 21 days of the date of this Order, all staff responsible for assisting clients with applications, recertifications, renewals or change of address forms, receive training concerning their duties under this Order and Section 7 of the NVRA, based on materials to be created in consultation with Plaintiffs.

12.     On or before 10 business days after entry of this Order, Defendants shall secure, deliver to, and post prominently in each DPW and DOH office appropriate signage to notify public assistance applicants and clients of their right to assistance with voter registration therein.

13.     On or before 10 business days after entry of this Order, Defendants shall commence weekly reporting by each DPW and DOH office to Defendant Aichele, with copies to Plaintiffs' counsel, identifying the number of clients that checked "yes" on a voter preference form, the number of clients that checked "no" on a voter preference form, the number of clients that left a voter preference form blank, and the number of completed voter registration applications transmitted by the agency site to election authorities in the time period covered by the report.

14.     On or before 30 days after entry of this Order, Defendants shall submit a report to the Court detailing the actions taken to implement the requirements of this Order and confirming that all requirements have been implemented.

15.     This Order shall be binding on Defendants, their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of the foregoing.

16.     This Order shall remain in effect pending the entry of the Court's final judgment in this action, unless terminated or modified earlier by further Order of this Court.

Plaintiffs submit that the foregoing relief is reasonable and necessary to remedy and prevent Defendants' ongoing violations of Section 7.  *ACORN*, 2008 WL 2787931, at *8 (ordering preliminary injunctive relief for Section 7 violations).

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court grant their Motion for a Preliminary Injunction.

Dated:  July 24, 2012                    HOGAN LOVELLS US LLP

_____

By:     David Newmann (PA#82401)
          Virginia A Gibson (PA#32520)
1835 Market Street, 29th Floor
Philadelphia, PA 19103
(267) 675-4600

Counsel for Plaintiffs
Black Political Empowerment Project and
Pennsylvania Communities Organizing for
Change,
Inc., doing business as ACTION United

Co-Counsel for Plaintiffs
(*pro hac vice applications to be submitted*):

David Rubino                             1401 New York Avenue, N.W., Suite
Dēmos                                    400
220 Fifth Avenue, 2nd Floor              Washington, D.C.   20005
New York, NY 10001                       (202) 662-8336
(212) 485-6239
                                         Sarah Brannon
Robert A.  Kengle                        Michelle Rupp
Alejandro Reyes                          Project Vote
Lawyers' Committee for Civil Rights      1350 Eye Street, NW, Suite 1250
Under Law                                Washington, DC  20005

(202) 546-4173